EDMUND STITES

*v.*

WALDEN STITES.

[Decided April 25th, 1905.]

The complainant was, on July 11th, 1904, about eighty-two years of age, in feeble health, nearly blind, illiterate and unacquainted with the conduct of business or the meaning of the most ordinary legal instrument. He owned one-third of an oyster-shipping business and its equipment, in partnership with his two sons, Edmund and Howard, who held two-thirds of that business. His other son, Walden, the defendant in this cause, was not a partner, but was employed by the complainant individually to work at the business. On July 11th, 1904, the defendant procured a bill of sale, in writing, to be prepared, expressed to convey presently all of complainant's interest in the business to the defendant for the sum of one dollar, and leading the complainant to believe that the paper would not take effect until after his death, induced him to execute it without any valuable consideration whatever. The defendant afterwards refused to surrender it.—*Held*, the bill of sale did not conform to the intention of the grantor, who executed it under a misapprehension of its effect, and should be declared void.

The bill of complaint in this case is filed by Captain Edmund Stites, of Cumberland county, New Jersey, against his son, Walden Stites, the defendant, and seeks to have a paper-writing dated July 11th, 1904, made by the complainant to the defendant, and purporting to convey the complainant's one-third interest in an oyster business at Bivalve, in Cumberland county, to the defendant declared to be null and void, delivered up to be canceled, and for a restraint enjoining the defendant from disposing of the bill of sale or of the property therein described and for further relief.

The complainant alleges that for many years he has been engaged in the oyster-shipping business at Bivalve in the name of Captain E. Stites, and that he has associated with him two of his sons, Edmund Stites, Jr., and Howard Stites; that the active management of the business is in the hands of Edmund

Stites, Jr., who keeps the books and accounts and acts as managing partner. Complainant further alleges that he is eighty-two years old, and by reason of his advanced age and bodily infirmities has not been able to give much attention to the details of the business, which is largely conducted by his son; that he has employed his other son, Walden, the defendant in this suit, to take his place as one of the partners, and has paid Walden for that service $400 per year, and that during the past year there have been differences between the two sons, Edmund and Howard, touching the conduct of the said business.

The bill of complaint further alleges that on July 11th, 1904, the defendant, Walden Stites, came to the complainant's home in Newport, and was there joined by his brothers Howard and Edmund; that Walden produced from his pocket a paper-writing, which he explained was a bill of sale from the complainant to him of all the complainant's one-third interest in the oyster-shipping business and the property belonging thereto, and the defendant, Walden Stites, importuned the complainant then and there to execute the bill of sale, stating that, if made, it would put an end to the differences between Edmund and Howard; that the complainant was unwilling to part with his property and deprive himself of the income upon which he is obliged to support himself and his aged wife, and declined to execute the paper; that said defendant and also Edmund Stites, Jr., thereupon assured the complainant that the paper would not take effect until after the death of the complainant. That the paper was read to the complainant by his son, Edmund Stites, but that he had no copy thereof, and cannot say what the exact language was, but he understood from what was read to him, as well as the assurances given to him by his son, that it was not to take effect during the complainant's lifetime, and that his signing thereof would not in any way interfere with or affect the complainant's entire and complete ownership and control of his one-third of the said oyster-shipping business during the term of his natural life; that thereupon the complainant signed the paper produced by the defendant which was then taken away by him.

The bill of complaint further alleges that no consideration

whatever was paid to the complainant for the execution of the paper, either at the time it was made or at any other time; that no consideration was expected by the complainant, as his sole purpose and intent was to make a gift to take effect only after his death. The complainant further says that he did not cause the paper to be drawn, and had no knowledge of it until produced by the defendant, Walden Stites, as above stated.

That some weeks thereafter the complainant was informed that the defendant claimed that the paper which the complainant had signed was an actual bill of sale, taking effect immediately, of all the complainant's one-third interest in said business and property, and that the defendant had endeavored to have it recorded, and consulted counsel on the point whether said paper did not operate to immediately vest in him, the defendant, the right to the present possession, use and enjoyment of the complainant's one-third interest in the business and property; that the complainant thereupon engaged counsel to secure the cancellation of said bill of sale, and immediately requested defendant to deliver it up; that the defendant refused to do so, and further insisted that the paper gave him one-third of the business, and that he knew what his rights were, and intended to keep both the paper and said one-third of the business and property.

That at first, though repeatedly requested, the defendant refused to exhibit the paper to complainant or his counsel, but that afterwards the defendant, pursuant to request, did furnish what he alleged was a copy of said bill of sale, which copy is in these words:

"Know all men by these presents, that I, E. Stites, Sr., for & in consideration of the sum of one dollar, to me in hand paid, the receipt whereof is hereby acknowledged, have bargained and sold and by these presents do convey unto W. Stites, of Port Norris, N. J., C. of C. 1/3 interest in scows, 1/3 interest in floats & 1/3 in shipping business at Bivalve, known as the Oyster Shipping business, to have and to hold for his own proper use and behalf; and I, the said E. Stites, Sr., so do agree to warrant and defend the sale of the aforesaid goods and chattels against any person or persons claiming the same. In witness whereof I have hereunto set my hand & seal this eleventh day of July, A. D. 1904.

"In the presence of witnesses."

The complainant further alleges that it never was his purpose to execute and deliver to the defendant a bill of sale absolute in its terms, whereby the defendant was to become entitled in the complainant's lifetime to own and possess complainant's one-third interest in said business and property; that said paper was procured to be executed by misrepresentation on the part of defendant as to its effect and meaning; that it was executed by complainant under the belief that it would not take effect until after complainant's death, and that the attempt of the defendant to make claim under said paper in the lifetime of the complainant is a fraud upon the complainant and a gross abuse of the confidence reposed in him by the complainant. The complainant further insists that he executed the paper under a mistake in fact in that he understood from both the defendant and Edmund Stites, Jr., that the bill of sale was not to take effect or have any legal force whatever until after the complainant's death.

The complainant further alleges that the oyster business produces an annual income to him of from $800 to $1,000 per annum; that he has endeavored by himself, his counsel and by other members of his family, to procure the defendant to surrender the bill of sale, but that he absolutely refused to do so.

The complainant prays that the said bill of sale may be declared to be null and void, and may be delivered up to complainant to be canceled, that the defendant may be restrained from making disposition thereof, or of the property therein described, and for further relief.

The defendant, Walden Stites, answers the bill of complaint, admitting that the complainant has been engaged in the oyster business with his two sons, Howard Stites and Edmund Stites, Jr.; that the complainant is eighty-two years of age, and that he has not given much attention to the details of the business because of his advanced age and bodily infirmities, and alleges that the complainant, because of his lack of business experience and capacity, never did bestow upon the firm's business any more time and attention than would be required of an ordinary hand on the wharf, and that Howard Stites never had anything to do with the business of the partnership save as an ordinary laborer.

The defendant admits that the complainant employed him to assist in the conduct of the business instead of the complainant, and agreed with the defendant that for his services the complainant would pay him $400 per year, and further promised him that if he would represent his interest in the firm, and render such services thereto as were due from the complainant, he, the complainant, would, at his decease, give to the said defendant the complainant's one-third interest in the copartnership and its assets, exclusive of any oyster boats or oyster grounds belonging to the business. The defendant admits that differences have arisen between Edmund and Howard Stites in relation to the management of the business, and that they caused the complainant much anxiety and concern, and he alleges that the differences were a menace to the business of the firm to such an extent that Edmund threatened to withdraw from the partnership because of them, and that if he carried out his threat he would, because of his control of the business for the last thirty years, have withdrawn from the firm all of its patronage in the shipping business, and that the defendant, because of his close relations with Edmund, would also have left the business and gone with Edmund.

The defendant, further answering, alleges that in July, 1903, Edmund proposed that owing to the differences between himself and Howard the partnership should be dissolved, and that the complainant and Howard should continue business together, and Edmund should go into business by himself; or that they should agree upon the value of their respective interests, and that either one or the other should buy or sell. That the complainant and Howard objected to this plan because it was too late in the season, and Edmund thereupon agreed to continue the business until the summer of 1904, but insisted that Howard and complainant should agree in writing that at that time they would either buy or sell, which agreement was made and signed by the parties; that at the annual settlement in the summer of 1904 Edmund insisted upon the agreement for the dissolution of the partnership being carried into effect, and that the complainant stated to Edmund that they would prefer to accept the first proposition which was to dissolve the partnership, and com-

plainant and Howard keeping the business themselves, and said Edmund to go into business by himself, and this agreement was agreed to by all three members of the firm.

The defendant further alleges that after this arrangement to dissolve, the complainant and Howard came to defendant, Walden Stites, and invited him to unite in a copartnership with them to continue the business; that the complainant stated to defendant that he was to have his (the complainant's) interest in the business, and when this defendant inquired what he would have to show for the same, the complainant replied that he had made a will wherein he bequeathed to defendant his interest in the business exclusive of oyster boats and oyster grounds; that defendant was not satisfied with this arrangement and insisted that before he would go into the business the interest of complainant should actually be transferred to him so that he would have complete possession and control of the same; that shortly afterwards complainant told defendant to see Edmund and ascertain whether he would remain in the partnership if the complainant would transfer to the defendant his interest therein; that the defendant did so, and Edmund took the proposition under consideration and concluded that if the complainant would so transfer his interest so that defendant would be in full control thereof, he, Edmund, would not withdraw from the business, but would continue in association therewith. The defendant is upon friendly terms with Edmund and Howard also, and is the only person connected with the business whom Edmund can leave in charge thereof during his absence, and that the sole inducement for Edmund to continue in business was the transfer of the complainant's interest to the possession and control of defendant, which would give to Edmund the assurance of a fair control of the business by removing therefrom the complainant, who was under Howard's domination. That Howard expressed his satisfaction with this arrangement, and promised to see his father and ascertain whether it was satisfactory to him. That Howard afterwards reported to defendant that it was satisfactory, and arrangements were made between Howard and defendant to meet at the complainant's residence at Newport and execute the necessary papers; that

defendant had the bill of sale drawn for the interest of the complainant in the oyster-shipping business, whereby in consideration of the sum of one dollar, the complainant sold and conveyed to defendant his one-third interest in the shipping business, his one-third interest in the scows and boats and one-half the float frontage used in connection therewith at Bivalve aforesaid. This bill of sale the defendant took with him on July 11th, 1904, first to the residence of the complainant, where he found Edmund Stites, Jr., and both Edmund and the complainant came with the defendant to the house of Howard. Upon their arrival there defendant produced the bill of sale which was examined and read by Howard, who expressed himself as satisfied therewith, and was then read to the complainant by Edmund Stites, Jr., in the presence of Howard and of the defendant, and that the complainant said that he was satisfied with it and then executed it and delivered it to defendant. The defendant insists by his answer that the true consideration of the bill of sale was to induce the defendant to continue his connection with the business, and to obtain the valuable services of Edmund for the benefit of the business through the influence and persuasions of defendant, and to avoid the loss to complainant and Howard which would result from the dissolution and withdrawal of Edmund and defendant therefrom, which the defendant insists would, if it had happened, have occasioned a loss in profits to complainant and Howard of at least $500 per annum to each, and that it was to save themselves from this loss and retain the valuable services of Edmund and this defendant in the business that the proposition to transfer the complainant's interest was made to defendant by the complainant and Howard. The defendant further alleges that there was a further consideration that the defendant should pay the complainant during the term of his natural life one-third of the net profits arising from the business after deducting therefrom $400 per annum for the defendant's living expenses. Upon the execution and delivery of the bill of sale to him, the defendant entered upon the performance of his duties as a partner until the month of September, 1904, without dissatisfaction in any respect either to the complainant or Howard Stites, and the

first intimation the defendant had of any dissatisfaction with the transaction was in September, 1904, when the complainant, with his attorney, J. Ogden Burt, visited the defendant. The defendant denies that the circumstances connected with the execution of the bill of sale happened as stated in the bill of complaint; denies that he importuned or tried to persuade the complainant to execute the bill of sale; denies that either Edmund or the defendant stated to the complainant· that it would not take effect until after the complainant's death, and that there was any assurance given to complainant by anybody at the time of the execution of the bill of sale that he should retain the ownership or control of his interest during the term of his natural life; denies that no consideration was paid to complainant on the execution of the bill of sale, or that it was the intent of the complainant to make a gift of his interest which should take effect only after complainant's death, and insists that the transfer of complainant's interest was upon a full, fair, valuable and sufficient consideration; denies that the complainant had no knowledge of the bill of sale until it was produced to him by the defendant, and insists that Howard Stites had stated to complainant that such a bill of sale was to be submitted to him for execution; admits that in September, 1904, Mr. Burt, the attorney, and the complainant interviewed the defendant and demanded a return of the bill of sale, and that the defendant refused to return it, and insisted that it was a valid transfer of complainant's interest. He admits that the complainant and Burt requested a copy, and avers that as soon as he had an opportunity to do so he made a copy of it and sent it to Mr. Burt. He denies all misrepresentation in obtaining the bill of sale, and that it was executed by complainant in the belief that it was not to take effect until after complainant's death, and denies that the claim of defendant under the bill of sale is a fraud on the complainant, or an abuse of any confidence reposed in defendant, and further, that there was any mistake in executing the bill of sale, and that the complainant has any right, legal or equitable, to have it canceled.

Issue was joined on these pleadings and the cause came on for hearing.

*Mr. J. Ogden Burt* and *Mr. Walter H. Bacon,* for the complainant.

*Mr. William A. Logue* and *Mr. Warren Dixon,* for the defendant.

GREY, V. C.

The proofs in this case show, without substantial dispute, that the complainant, Captain Edmund Stites, established many years ago an oyster-shipping business at Bivalve, in Cumberland county. He took two of his sons, Edmund Stites, Jr., and Howard Stites, into his business as equal partners with himself, without their paying him anything therefor. In July, 1904, the complainant was eighty-two years of age, in feeble health, nearly blind, could not read a page of writing, could scarcely sign his name, and as he appeared on the witness-stand, was incapable of comprehending the meaning of the usual and ordinary words of a conveyance, and still less their operative force and effect, unless aided by patient and careful explanation. His business capacity is perhaps appreciatively, if not respectfully, expressed by the defendant in his answer, when he described his father as so lacking in business experience and capacity that he never bestowed on the partnership business any more time and attention than would be required of an ordinary hand on the wharf. The defendant, Walden Stites, had for years intimately known his father's incapacities, both mental and physical, and because of his father's physical infirmities and lack of business knowledge, had been employed and paid by his father to perform in his stead his duty to the firm. He testified on the stand relative to the conduct of the business of a proposed new partnership that "Pop is too old." It is also plainly to be seen that the defendant had secured the entire confidence of his father, who relied upon his good faith without hesitation or doubt.

As the business was conducted prior to the making of the disputed bill of sale, on July 11th, 1904, the partners were the father, Captain Edmund Stites, and the two sons, Edmund Stites, Jr., and Howard Stites. The defendant, Walden Stites,

had no interest in the firm; he was merely an employe. His own testimony defines his anxiety to become the owner of a present interest in the firm when he narrates that on July 8th, 1904, he told his father that when he dropped off, "the rest of the heirs would come in and do me out. I would not have anything to show." "Oh," said the father, "that can't happen; they couldn't take it away from you after I am gone; I have willed it to you." ·

  This was the situation of the parties to each other just before the bill of sale of July 11th, 1904, was procured by the defendant from his father. The incidents of that day are narrated by the defendant himself, in his testimony as follows: The defendant had the paper drawn by a justice of the peace, and had an appointment with Howard Stites that on the afternoon of July 11th, 1904, he should come to Howard's house, which was next door to their father's house. At this time the defendant testifies that he had not spoken to his father about the bill of sale. The defendant took it with him to Howard's house, but did not show it to him, and waited there about half an hour, until Edmund Stites, Jr., arrived and went into the father's house. The defendant then went over to the father's house and said, "Let's go and settle this up." The three of them, the father, Edmund, Jr., and the defendant, then went over to Howard's house together, into the dining-room. The defendant produced from his pocket a bill of sale, upon someone's request, and started to read it. The father said, "Let Eddie read it." Edmund Stites, Jr., then read it carefully as it was written. After that the defendant asked the father if that was satisfactory; he said it was. It was then passed to Howard, who read it and said, "It suits me." It was then executed, and Howard returned it to the defendant, who put it in his pocket. After he had put it in his pocket, he said, "Now, Eddie, understand that you pay Pop the one-third of the profits, the same as you always did; I can work, the same as I always did, for Pop is to get the profits, not me; is it all right?" Eddie says, "It is."

  This is the defendant's own account of the obtaining of the bill of sale in dispute. An examination of ·its contents will

show that it is an absolute transfer to the defendant, for the nominal sum of one dollar, of all the interest of Captain Edmund Stites in his oyster business and its equipment, which it is proven produced to him an annual value of from $800 to $1,000. Nothing in the instrument reserves to him the one-third profits of the business, the same as he had always had.

This bill of sale, it is undisputed, was drawn at the dictation of the defendant, by a person selected by him, apparently in the absence of the complainant, and without consultation with him. It was not shown to 'or read or explained to him, or seen by him, until the moment when he was induced by the defendant to execute it. He had not the protection of the advice of counsel upon it, nor even the aid of a disinterested, intelligent business man. The defendant was, of course, intensely interested that his father should presently give him his third of the oyster business. Edmund Stites, Jr., was also desirous of getting the old man out of the firm. Howard Stites, whose capacity the defendant, in his answer, rates as that of an ordinary laborer, is stated by the defendant in his answer to have joined with the other sons to take from the old man his interest in the business.

In September, 1904, the father demanded from the defendant the return of the bill of sale. The defendant refused him. He then brought a lawyer, Mr. Burt, who told the defendant that he wanted to see the paper because his father wanted to be told exactly what kind of a paper he had executed. The defendant did not show it, but said it was all right, that it was just what it undertook to be, and he meant to keep it. Mr. Burt then asked for a copy, and the defendant said he would send him a copy the next day. This he did not do, but a few days later he called at Mr. Burt's office with an incomplete paper, which was a suggestion of a copy, saying he was not going·to make a copy; it was too much work. Another demand to see the original, or for a copy, was made on the defendant, and a day or two after he sent what purported to be a copy.

The account given by the complainant and by Howard Stites and his wife, touching statements made to the father to induce

him to sign the paper, vary considerably from that given by the defendant and Edmund Stites, Jr.

Captain Stites, the complainant, as he appeared on the witness-stand, is obviously a very old man, nearly blind, illiterate and ignorant of business methods. He testifies that he was told that the paper did not take effect till after his death, and he would not have signed it otherwise. Howard Stites testifies that on the occasion when the paper was executed it was read to his father by Edmund Stites, Jr., at the defendant's request, and that his father, before he signed it, was told by the defendant that it did not take effect until after the father's death. Mrs. Howard Stites testifies that in passing in and out of the room she heard the part of the conversation in which this assurance was given by the defendant.

The defendant's counsel, in cross-examining Howard Stites, asked him if he did not have an appointment with his father to come to his house for the purpose of signing this paper. Howard Stites said he had not, that it was the defendant and not he who went in for his father and brought him into Howard's house to execute the paper.

There was also an effort to put in evidence, as admissions binding upon the complainant, statements made by Howard Stites (touching the subject of the bill of sale) out of the complainant's presence, upon the ground that the complainant and Howard were partners, and that this gave Howard a right to speak to bind his father. This proposition was overruled. The authority of a partner, in speaking to bind his partner, is limited to words spoken in the conduct of the partnership business. The making and obtaining this bill of sale from Captain Stites was not the conduct of partnership business. It dealt, it is true, with Captain Stites' share of that business, but the firm as such was in no sense a party in the transaction.

Upon the evidence in the whole case, I am satisfied that the complainant was led to give the bill of sale to his son, the defendant, under the belief that it would not operate to take away his share of the business until after his death. The principles stated in the *per curiam* opinion of the court of errors and appeals in the case of *Thorp* v. *Smith,* 65 N. J. Eq. (*20 Dick.*)

*400,* are applicable here. The complainant in the case now before me was advanced in years, in a feeble condition of health, nearly blind, unable to read the disputed instrument, which was prepared beforehand under the direction of the defendant, the son who expected to benefit by its execution. The complainant was obviously so unacquainted with business methods that he was unable to understand the meaning and effect of the bill of sale without careful and extended explanation. The instrument was kept by defendant in his own possession, without reading or explanation to the complainant, until the defendant was ready to have it executed. The complainant had never theretofore seen the paper; he had no opportunity to consult counsel or have the advice of any disinterested, intelligent business man. It disposes of property which produced to the complainant from $800 to $1,000 annually.

The defendant and Edmund Stites, Jr., insist that the complainant comprehended the fact that by the bill of sale he was presently giving away his one-third interest in the oyster business, upon an understanding that the defendant should allow his father to have the profits of his share (less $400 annually) as long as he lived, and that the complainant did this in order to put the defendant into the firm so that he and Edmund Stites, Jr., might control it, and thus induce Edmund Stites, Jr., not to leave the firm and set up business for himself in opposition to his father.

There is some testimony which indicates that one of the motives which led the old man to the making of the bill of sale was the assurance that it would pacify the disputes which had arisen between his two sons, Edmund Stites, Jr., and Howard. But proof of the existence of the old man's desire for peace in the family does not show that he intended by the bill of sale presently to give away his share of the business to obtain that peace, nor does it show that when he made that instrument he understood that he was making an absolute, presently operating gift of his share in the business to the defendant.

The complainant and Howard Stites both declare that the old man was assured by Edmund and Walden that the instrument did not take effect until after his death. Mrs. Howard

Stites heard some such assurance given to the old man. Their statements appear to me to be much more credible and consistent with the whole transaction.

The instrument itself purports to be an absolute bill of sale presently passing title to the complainant's share of the oyster business and its equipment to the defendant. It mentions no other consideration than the nominal sum of one dollar. The consideration declared by the defendant to have been a part of the bargain, *i. e.*, a reservation to the complainant of the profits on the share conveyed to the defendant, less $400 annually, was not a valuable one. The complainant already owned all those profits.

The defendant's further contention is that the transaction was an effort by the old man to bring his sons, Edmund and Howard, into peaceful relations, a sort of harmonious family adjustment; Edmund was to abandon his purpose to start business in opposition to his father; Waldie was to give up his plan to join him; Howard was to be outvoted in the firm, and the complainant was constrained to pay for this peace by presently giving his share of the business to Waldie for nothing. Not a word of this was expressed in the written bargain. The opinion of the courts of New Jersey upon transfers of property obtained by children from a parent who is aged, infirm and dependent upon them, by threats to subject him to loss and embarrassment if he does not give his property to suit them, may be seen in the *Sickles Will Case,* *63 N. J. Eq.* (*18 Dick.*) *233;* *64 N. J. Eq.* (*19 Dick.*) *791,* where threats to abandon an old bed-ridden father were held to invalidate a will obtained by such methods, to be made in favor of the son and his wife, who lived with the father and made the threats.

Taking the narrative of the transaction as given by Walden and Edmund Stites, Jr., to be true, it yet remains that they obtained from the complainant this conveyance of all his share in the business without paying or agreeing to pay him any valuable consideration therefor, and upon an assurance that after the conveyance he should continue to have the income from his share during his life. It is perfectly apparent that the complainant in this transaction depended upon the defendant, who

was not only his son, but also his trusted employe. His age, his infirmities, his ignorance of such business and his reliance on the defendant made him peculiarly liable to be misled. The bill of sale, as prepared under the defendant's direction, is amply efficient to pass to the defendant the complainant's title, but makes no mention of any reservation to him of the one-third of the profits of the business during his life. All the benefits of the expressed bargain are with the defendant; none of the admitted reservations saving anything for the complainant appear in the written contract. This phase of the case is within the principles discussed and applied by Vice-Chancellor Van Fleet in *Mulock* v. *Mulock, 31 N. J. Eq. (4 Stew.) 601.* In that case three separate deeds of gift were obtained by a son to be made by his old mother to him, two of them under a belief on her part that they were releases. The defendant son testified that the mother said "she would give him the properties, but would keep the rents," and that he said, "Very well." The two deeds were, in fact, absolute conveyances of large values, reserving nothing.

The vice-chancellor held that it was the duty of the son in such a case to see that the instruments to be executed by his mother were sufficient, legally, to carry her whole scheme into effect, and also to see that she fully understood their nature, effect and consequences, and that a failure in any one of these important duties was a fraud, which must set the whole contract aside.

On appeal, *32 N. J. Eq. (5 Stew.) 360,* the court of errors and appeals declared that the validity of the two deeds could not be maintained, but reversed the decree so far as it set aside the third deed, because, in the view of the court of errors and appeals, the evidence showed that deed to have been intelligently and freely made by the complainant. The principles of law declared by the vice-chancellor were not in any way disapproved. The same views have been declared in various other cases of like character, to the effect that where one who occupies the position of a caretaker obtains the person who depends upon him to convey his property to the caretaker in consideration of his agreement to render future services of support, it is

the duty of the caretaker to see that the consideration which is to proceed to the dependent party is expressed with the same certainty and facility of proof as that which passes to the caretaker. *Mott* v. *Mott, 49 N. J. Eq. (4 Dick.) 209; Hammell* v. *Hyatt, 59 N. J. Eq. (14 Dick.) 187; Collins* v. *Toppin, 65 N. J. Eq. (20 Dick.) 439.*

The complainant in this cause, because of his physical infirmities, his ignorance of business methods, and the contrivance of the defendant, which required him instantly and finally to act in making the bill of sale, was in a condition of entire dependence upon his sons, particularly the defendant, whom he utterly trusted. The defendant's interests were, as is stated above, perfectly cared for by the bill of sale, but the complainant's were not only not protected, but the instrument was so drawn that they were apparently excluded.

The bill of sale should be declared a nullity, in accordance with the views above expressed.